# Strong, et al. v. Kentucky River Hardwood Company, et al.

# Morse, et al. v. Kentucky River Hardwood Company, et al.

(Decided November 12, 1920.)

## Appeals from Breathitt Circuit Court.

1. Adverse Possession—Occupancy—Action to Enjoin—Trespass.— In a suit to enjoin trespass where the issue of adverse possession is narrowed to an alleged vacancy of two years, and the proof establishes that during said period the property was occupied by one or more tenants of plaintiff, there being no break in the continuity of possession plaintiff having shown satisfactory possessory title under the statute is entitled to the relief granted.

2. Trial—Transfer of Causes.—A motion for an issue out of chancery and for a trial by a jury, made about a year after the answer was filed, was too late, proof having been taken by the plaintiff in the meantime. Under section 10 of the Civil Code it is provided that defendant when he answers may have the cause transferred from equity to the ordinary docket, but this motion should be seasonably made, and it was not an abuse of discretion for the court to refuse to make the transfer on motion made eleven months after answer had been filed.

3. Adverse Possession—Action to Enjoin Trespass.—In an action involving the adverse possession of land, where it is shown that plaintiffs' possession was adverse, open, notorious, continuous and hostile for the statutory period, and known by the defendants, who claimed as joint tenants to be so, the possession of plaintiffs is such as entitled them to the relief sought.

HOBSON & HOBSON, J. B. ADAMSON and ADAMS & HOLLIDAY for appellants, Jack Strong, et al.

W. G. DEARING and W. O. CHENAULT for appellants, Charles P. Morse, et al.

G. W. FLEENOR, O. H. POLLARD, CHESTER GOURLEY, W. B. DIXON, L. Y. REDWINE and KELLY KASH for appellees.

SAMUEL M. WILSON for appellee, Kentucky Union Company.

OPINION OF THE COURT BY JUDGE QUIN—Affirming.

Alleging it was the owner of and in possession of a described tract of land appellee, Kentucky Union Company, by its petition in this case sought to enjoin appellants from the commission of certain trespasses thereon.

Similar relief was asked by appellees, Buskirk and Croft, trading as the Kentucky River Hardwood Company who joined as plaintiffs, claiming to be the owners of the timber on said land.

In the judgment appealed from the prayer of the petition was granted, the petition and counterclaim of Henry Duff and other appellants to be made parties was dismissed, as likewise the petition of appellants, Charles P. Morse, and others.

By separate appeals the unsuccessful parties are seeking a reversal of said judgment.

The land in controversy covers an area of 903 acres on Lick branch of the North fork of Kentucky river.

Colonel Edward Strong acquired by deed of July 27, 1829, from Henry Duff, title to 500 acres, more or less, on the North fork of Kentucky river, "to include all the land fit for cultivation on said branch." The tract lying on the east side of Lick branch is not in controversy.

Colonel Strong had a good possessory title to this boundary and lived thereon until his death in 1869. Prior to his death Colonel Strong claimed title to the land in dispute, that west of Lick branch. This right, however, was questioned by others, as appears from two agreements between Breck and South on the one part and Edward Strong on the other, one bearing date May 25, 1860, the second undated and in which first parties dismiss a pending suit in ejectment against Strong, leaving Strong and Barnett to settle the matter of the latter's improvements. Barnett resided on the land until 1864 or 1865, when he moved, but not until they had had litigation over the matter.

The colonel had tenants on the Lick branch property. These are generally referred to as the "Coles and Barnetts," but as to the latter it is apparent the senior Barnett was claiming the land during his occupancy of same. As to the other tenants it is not clear whether they resided on the land in controversy or not. The proof does not disclose that character of claim or possession on the part of appellants sufficient under the statute to establish a title by adverse possession.

During the Civil War, William Strong, a son of Colonel Strong, was claiming the land and he forcibly removed Cole and Barnett therefrom. This was before his father's death. There is evidence of a lease from Edward Strong to Elizabeth Cole, dated March 3, 1865, of a tract of land on Lick branch.

The heirs of Colonel Strong by two separate instruments executed in December, 1873, conveyed to their kinsman William Strong land on Lick Branch, including all the land on said branch fit for cultivation, containing 500 acres, more or less, also "all the land on said Lick branch below said two large rocks owned by Edward Strong, Sr., at his death." In one of the deeds the land is referred to as the home farm of Edward Strong, Sr. The parties do not agree as to the extent of the boundary covered by these deeds. It is the contention of appellants that by these conveyances Captain Strong, as he (William) is called, became the unquestioned owner of the 500 acres and the balance of the property remained the property of the heirs. Appellees claim that Captain Strong purchased the interest of the other heirs of Colonel Strong in the whole tract and offers as reasons for the failure to include the whole description, (a) the grantors thought the description covered it all and it was omitted by mistake, (b) the heirs were willing to convey the home farm with a covenant of "general warranty, but were afraid to warrant title to the land in controversy as the colonel did not own it." But, they contend that from as early as 1874 Captain Strong was in the actual, open, notorious and hostile possession of the land. That he was not a joint tenant as appellants insist.

In 1882 Captain Strong and his wife conveyed to James M. Thomas, agent, a total of 1,738 acres on Lick branch, reference being made to the deed from Wilson to Duff in 1828 and from Duff to Edward Strong in 1829. By successive conveyance the Kentucky Union Company is claiming title to the land and the Kentucky River Hardwood Company to the timber.

Two periods of possession are relied upon by appellees, viz.: (a) from 1874 to 1891, during the actual possession by Captain Strong and his grantees, and (b) from 1894 to 1912, when the present suit was instituted.

As appellants have in the main devoted their brief to a discussion of the latter period and since the conclusion we have reached in regard thereto is decisive of the appeal we will consider only the second of the two expanses of time.

There are two main forks of Lick branch, the Right or Road fork and the Left fork from which the Wolf Pen and Cane Patch forks branch. Little and Big Rattlesnake branches are tributaries of the latter. At least two houses

stood on the disputed land during the years involved, one on Road fork and the other on Cane Patch fork.

The principal event in this record, the one permanently fixed in the minds of the two hundred and more witnesses, is the killing of Captain William Strong on Sunday, May 9, 1897. Things happened so many years before or after this time. But for this date it is doubtful if it would be possible to fix with any degree of certainty occurrences and events necessary to a settlement of this controversy. We will discuss separately the occupancy of the two houses.

1. Cane Patch. It is conceded that Henry Clay, as a tenant of the Kentucky Union Company, erected a house and took up his residence on the property in 1894. The witnesses do not agree as to the exact month; one of the appellants places it as February; Henry Clay says he moved there in the fall. Several of the appellants say that Henry Clay remained in that house until the fall or winter of 1896, probably October of that year, when he moved to his father-in-law's place on Canoe fork, and away from the land in controversy. Green Clay, Henry's brother, moved in about the time Henry is said to have vacated the premises. He remained but a few months and whether he took possession in the fall of 1896 or February of 1897, the witnesses (for appellant) agree that he left in the spring of 1897, and it is insisted that from this time no one ever occupied that house until 1899. Appellant Henry Strong places the last vacancy period as the "summer of '97 or '98." If the premises were unoccupied during those months appellees' case must fail unless the house on Road fork was occupied at this time.

Many witnesses testify that the Cane Patch house was not occupied in 1897 and 1898. One of the reasons assigned is the trouble between two contending factions. Clay being friendly to the side of Captain Strong it is said he sought safety in Rich Hollow, a community removed from the neighborhood in which he had been living. Several testify they passed the Cane Patch house during these years and saw no sign of life there; weeds had taken the place, no crops had been planted and the house was well nigh uninhabitable. One witness says he was frightened by a number of sheep that jumped out of the house as he passed by. Another says hogs and cattle passed in and out of the house.

On the other hand a vast number of witnesses testify the Cane Patch house was occupied continuously during

1897 and 1898. Henry Clay says he built the house in 1894, and lived there continuously until 1899, and that his brother Green Clay moved in three weeks before he (Henry) left and remained there two years. Witness says he was living there at the time Captain Strong was killed. Varied are the experiences and events which go to assist the witnesses in their recollections as to the occupancy of the Cane Patch house in 1897 and 1898; for example, one helped Henry to hoe his corn; others visited his family there; another recalls the Clays resided on Cane Patch when she moved to the Strong farm; the memorable May 9, 1898, the assassination of Captain Strong; the purchase of chickens from Clay; borrowing of Henry's mare to do the plowing on the Myer's farm; the marriage of one of the witnesses in April 1898; a call by a country doctor and local preacher to see a sick child at the Clays shortly after the Captain's death; recollection of a chum of Henry's boys who went to school with them and frequently spent the night with them.

Rachel Clay (Henry's wife) corroborates her husband as to the years they lived on Cane Patch; two of their children were born while they were there, Enoch in 1895, and Nancy in 1898; many others, including Mrs. Clay's father and sister and oldest son, remember the birth of these two children while the Clays were on Cane Patch. Ellis Cole, who spent most of her time doctoring people, and who was importuned to remain in the neighborhood, was present when the elder of the two children was born.

Further proof of Henry Clay's residence here is shown by the school census in 1898, which includes five of his children and the assessment rolls for 1897 and 1898, Cane Patch being within both the school and assessing districts in which Clay is listed.

2.  Road fork. Bob Little is to the Road fork what Henry Clay was to Cane Patch, and the occupancy of the former during the year of 1897 centers largely around the possession of Uncle Bob, now deceased. Elijah Bush moved in this house in Februray, 1899, and was there when his deposition was taken. Ellis Cole moved to this house in March, 1898, and remained a year, or until Elijah Bush came. It is appellants' contention, supported by the testimony of several witnesses, that but for the occupancy of this house by Green Clay for about two months in the early spring of 1897 the house was vacant that year. It is their contention that Bob Little did not live there in 1897. As in the case of Cane Patch house

they introduced testimony showing the bad condition of the house, the absence of crops, the presence of weeds, and no sign of life that year.

For appellees many witnesses testify that Bob Little was living on the Road fork both before and after the death of Captain Strong. These witnesses saw him there that year, and talked to him. Green Clay says he moved there in the spring of 1896. Ike Clemmons was there at the time he hauled Ike's furniture back to the river for him. Green left there in the spring of 1897, made a crop of corn the year he was there; after he left, Bob Little moved in. Uncle Bob's son says they were on Road fork at the time Captain Strong was killed; they heard the shots and an hour or two later went to the Sulphur Gap and saw the dead man and his mule that had also been shot. Uncle Bob's widow says they were on Road fork from April, 1897, until the winter of that year and that Bob made a crop there. Some of Bob's relations helped him replant corn that had been uprooted by some hogs—this was in 1897.

If there was a break in the continuity of possession, and in the occupancy of the two houses from 1894 to 1912, it must have been in 1897 and 1898. The tenancy of Ellis Cole shortens this period by almost a year, as it is admitted she was on the Road fork from March, 1898, to the spring of 1899; it is further limited by the testimony of appellants' witnesses as to Green Clay's sojourn on the Road fork in the spring of 1897; thus in fact the controversy is narrowed to a period of about twelve months. It is impossible to reconcile all the evidence, but the weight thereof and the attendant circumstances favor the conclusion reached by the lower court.

The major portion of the testimony is that of interested parties. The heirs of Colonel Strong and Captain Strong are not lined up on one side. The Clays, their kinspeople and others state positively that Henry and his family occupied the Cane Patch house from 1894 to 1899. Henry was of a shiftless, nomadic nature, never remained long at any place, but the proof tends strongly to show his residence on Cane Patch for the years stated.

True there is much testimony that both these houses were in a dilapidated condition in both 1897 and 1898, and yet it is conceded that at least one of them was occupied a part of each of said years.

Witnesses testifying the houses were unoccupied were in the main those who chanced to pass along the road

some time during those years. The distance from the house on Road fork to the road is not made clear, but the Cane Patch house was some 150 to 200 yards from the road, thus it would not be an easy matter to tell at such distance whether the house was in fact occupied and especially is this true since farming without help and with meager tools made it necessary that the husbandman spend the major part of his time in the field during the crop season. And where members of the family helped, as is so often the case, it could easily give a passerby the impression that the house was vacant.

Some of the witnesses were hunters, others were seekers after lost and strayed cattle, and in their journey they say there was no evidence of life in or about either house.

Both houses were erected in 1894. Regardless of the character of material or manner of construction, it is inconceivable that three years later they could have been in the ruined, caved-in, rotten condition depicted by the numerous witnesses. Insecurity of construction and unskilled workmanship might account for a place early getting out of repair, but timber will not decay nor a house become dilapidated in so short a time. Lige Bush, as he is called, has been in one of these same "uninhabitable" houses all these many years.

Other persons had lived on these two forks prior to 1894, and witnesses, including those introduced by appellants, testify to having seen houses on both forks before this date. It is quite possible therefore that the houses seen and described by some of the witnesses to have been in such a deplorable condition in 1897 were those built some time prior to 1894, and there is no contention these were occupied. The existence of these older houses serves as an explanation of the testimony of the witnesses as to the dilapidated houses seen by them and thus the seemingly apparent irreconcilability in the evidence disappears.

On the question of occupancy we think the proof establishes the fact that for the period from 1894 to 1912 appellees have shown such a possessory title as entitled them to the relief granted.

The petition in this suit was filed August 7, 1912. October 7, 1913, a motion was made for an issue out of chancery and for a trial by jury. This motion was overruled and this is urged as reversible error. Considerable proof had been taken before this motion was made, but it was agreed by appellants that all depositions previously taken

by appellee might be read as evidence. The motion came too late. The answer and counterclaim was filed November 7, 1912, the motion of Duff and others to be made parties was filed February 5, 1913, a similar motion of Morse and others was filed June 17, 1913.

Section 10 of the Civil Code provides that a defendant by motion made when he answers may have an equitable action transferred to the ordinary docket. The motion should be seasonably made and this was not done in the present instance.

It is generally held that the motion should be made when the answer is filed, or within a reasonable time thereafter, and what is a reasonable time is a matter within the sound discretion of the chancellor. Furthermore, the weight of the evidence is such we are convinced a jury could not have reached a conclusion contrary to that stated by the chancellor. Appellants were not prejudiced by the refusal of the court to sustain the motion to transfer, nor did the chancellor abuse his discretion in so ruling. Chenault, &c. v. Eastern Kentucky Timber & Lumber Co., 119 Ky. 170, 83 S. W. 552; Proctor v. Tubbs, 166 Ky. 676, 179 S. W. 620; Riffe & Jones v. McKinney Deposit Bank, 171 Ky. 761, 188 S. W. 775.

The point is made that the grantees of Captain Strong were joint tenants with the Strong heirs and the adverse possession of the former was not of the character required under the decisions of this court. Whether tenants in common or not, the possession of appellees and their predecessor in title was adverse, open, notorious, continuous and hostile for the statutory period and known by the Strong heirs to be so.

What has been stated herein applies to the appeal of Morse and others as well as Jack Strong, et al.

For the reasons stated the judgment is affirmed.